F9oemacs

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4            v.                            13 CR 811

5   ANDY MACCOW,

6               Defendant.

7   ------------------------------x

8
                                          September 24, 2015
9                                         3:26 p.m.

10
    Before:
11
                    HON. ANDREW L. CARTER, JR.,
12
                                          District Judge
13

14                      APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  JASON MASIMORE
17       Assistant United States Attorney

18  WALTER MACK
         Attorney for Defendant
19

20

21

22

23

24

25

F9oemacs

1              (In open court)

2              THE DEPUTY CLERK:  Criminal cause for a sentencing in

3      case number 13 CR 821.  United States vs. Andy Maccow.

4      Counsel, please state your appearance for the government.

5              MR. MASIMORE:  Good afternoon, your Honor.  Jason

6      Masimore for the government.

7              THE DEPUTY CLERK:  And for the defendant?

8              MR. MACK:  Good afternoon, your Honor.  Walter Mack

9      for the defendant, Mr. Maccow, sitting to my left.

10             THE COURT:  Okay.  Good afternoon.  Good afternoon,

11     Mr. Maccow.

12             THE DEFENDANT:  Good afternoon.

13             THE COURT:  We're here to continue a sentencing

14     hearing that was begun some time ago regarding Mr. Maccow.  My

15     recollection is that last time we were here -- previously I had

16     determined the appropriate guideline range in this case and

17     determined that Mr. Maccow was in criminal history category III

18     and that his total offense level was 27, resulting in a

19     guideline range of 87 to 108 months.

20             Is that everyone else's recollection as well?

21             MR. MASIMORE:  Yes, your Honor.

22             MR. MACK:  It is, your Honor.

23             THE COURT:  And the last time we were here, we were

24     scheduled for a Fatico hearing.  My understanding, again, at

25     that time, is the parties determined it was no longer

F9oemacs

```
1    necessary; they didn't request any sort of Fatico hearing.
2                Just so the record is clear, that is still the case, I
3    take it?
4                MR. MACK:  That is true, your Honor, for the defense.
5                MR. MASIMORE:  Yes, your Honor.
6                THE COURT:  Then I heard from both parties before
7    regarding the appropriate sentence in this case.  And I
8    indicated I needed some more time to think about this.
9                I've had some time to think about this, but I will
10   give the parties an additional opportunity, if there's anything
11   else they wish to raise regarding the appropriate sentence in
12   this case.
13               Starting with counsel for the defense?
14               MR. MACK:  Yes, your Honor.  I do have a few moments
15   of information that I would like to provide.  I first would
16   like to introduce and indicate that Mr. Maccow's mom, sister,
17   fiance and his daughter are in court today.
18               THE COURT:  Okay.
19               MR. MACK:  And I would also say that there would have
20   been more people from the family here on the original
21   sentencing date that was adjourned, but because of the traffic
22   situation, and also the difficulty of some of whom who are
23   teachers, etc., are unable to be here today but would have been
24   here earlier in support of Mr. Maccow.
25               THE COURT:  Okay.
```

F9oemacs

1          MR. MACK:  So what I would like to state, at least as

2     how the defense sees the situation as it currently is --

3          THE COURT:  Okay.

4          MR. MACK:  -- the probation department in its

5     presence report, although we've spent time on that, its

6     recommendation to the Court was 121-month sentence, which was

7     somewhat vehemently opposed as being a warehouse sentence.

8     That was, of course, based upon their denial of the three

9     acceptance of responsibility points, and we are now beyond

10    that.  And I believe, although the government -- I think we've

11    just stated it.  I think their position is likely to be a

12    guideline sentence.  And guidelines, as we've just affirmed, is

13    the 87 to 108 months that the Court just mentioned and both

14    parties acknowledge.

15         What of course the defense is asking for is a

16    below-guidelines sentence.  It was set forth in my sentencing

17    recommendation filed back with the Court I believe on March 5.

18    And I wanted to just take a few moments, with the Court's

19    patience, to indicate why I believe that sentence is

20    appropriate under the circumstances.

21         I know the Court may have been unhappy with some of my

22    arguments on the objections to the presentence investigation.

23    I think I went through that one.  I would ask that whatever

24    concern the Court may have had in my comments be taken against

25    me, obviously, not against the defendant.

F9oemacs

<pre>
 1              I want to support my position very concisely.  Based

 2     upon the report, the presentence report, and other information

 3     that was presented to the Court in my sentencing submission --

 4     and I'm really not completely restating, but pretty much

 5     stating what I did say in my sentencing submission, neither of

 6     which considerations have been considered either by the

 7     government or by the probation officer.  In sum, what I am

 8     urging to the Court, based on the information before it, is

 9     that Mr. Maccow, during the time period of the conspiracy which

10     is charged, 2008 to 2013, 28 months of that time period he

11     actually was in custody.

12              So his actual involvement in the conspiracy was

13     somewhat obviously limited; that the reason the guidelines are

14     as high as they are is because of the tying to the drug

15     guidelines; because if we were only considering what the role,

16     in fact, was of Mr. Maccow, he was a burglar.  He did not have

17     anything to do with the distribution of the drugs, other than

18     burglarizing.  I'm not minimizing that.  But if only we were

19     considering the fact that he broke in without the tie to the

20     drug situation, his guideline would be 33 to 41 months.  And if

21     we were talking about the obstruction situation with respect to

22     time, his guideline would be 37 to 46 months.  So what actually

23     has inflated the guideline at 27 has been the tie to the drug

24     quantities, which were described by the government over the

25     course of the conspiracy.
</pre>

F9oemacs

1              Now, I think there is sufficient, and evidence even in

2     the PSR, that Mr. Maccow, during the time period that he was

3     active, which was when he got out of prison in I think it was

4     August of 2010, he was an addict.  He was addicted.  He was

5     taking somewhere between -- it's in the PSR -- 9 to 15

6     Percocets a day.  That was based upon or probably started

7     because of painkillers he started to take, either when he was

8     in a coma for a number of months, but more significantly, when

9     he was knifed and started.  I think the actual number that is

10    in the report is 9 to 15 pills per day.  He was taking liquid

11    heroin one to two times a day.  And basically he was smoking

12    marijuana basically day after day.

13             If you look at his rap sheet, which of course I have,

14    approximately half of the counts that comprise his criminal

15    history are marijuana-based; the other half, primarily burglary

16    based.  And his role -- I mean, during the time period, his

17    loot, or at least product, were pills that he received, which

18    he used for his own personal use.  These were the pills that he

19    was taking on a regular basis.

20             Now, it's not just that information, but also, what

21    has not been addressed at any length, which were significant

22    parts of my sentencing submission -- and I think the two most

23    important points that I just want to reiterate, which I think

24    are important, not only was he an addict at the time, but

25    furthermore, during the time period that we are here today is

7

F9oemacs

that he had the challenges -- I think I would say, to

summarize, without going into the detail of Dr. Paredes's

report, which the probation department, despite having it,

although may not have had it at a timely basis, as I had

originally sent it -- we have different recollections when they

got it, but they certainly got it in March in time to revise

the report.  And for reasons that I still do not understand,

the summary of what was in the report was that he was diagnosed

with mental issues, depressive disorder, specific learning

disorder.  He was considered an individual of diminished

capacity.  I mean, I'm not going to go in on the public record

to the percentiles and things that are in the report, but they

are very staggering in terms of his mental capacity and ability

to understand and make judgments.

        And finally, he was considered an addict with

marijuana opioid and stimulant disorders, with a recommendation

in the probation -- in the report of Dr. Paredes that he

received specific treatment called a MICA program, which I

happen to have some familiarity with, which is meant for

mentally ill, chemically addicted personnel.  And in essence,

that report was never considered.  No one has ever said

anything about it, either from probation or from the

government.  We think it's an important factor.

        And perhaps finally, and I think most important, the

family -- and this is part of my sentencing submission --

F9oemacs

perhaps unusually so in cases of this nature, has indicated to

your Honor, I think in 21 or 22 letters, or my number may be

off but nothing significant, which were attached to the

sentencing submission in March that, one, they loved him

dearly, which it's certainly not unusual; but more

significantly, that they would see that when your Honor

permitted him to depart his period of incarceration, that they

would supervise him, take responsibility for his conduct and,

in fact, see that he was employed immediately.  And I think the

gist of that representation to the Court is a significant one.

        And I think his mom is prepared, if the Court would

like to inquire on the subject, of the persons in the family

who are able to see that once he was released, that he would be

employed.  He would not be permitted to return to where he had

the difficulties that he did.  I'm not forgetting the

obstruction count.  He's a man of nonviolence.  The obstruction

count was a fist fight.  I understand.  I'm not in any way

changing anything that's been represented to the Court, but

what it was was a fist fight, and without significant injury.

        Other than that, there is no violence in his past.

The weapon that is cited in his rap sheet was a gravity knife

with extremely little -- I think it was a conditional discharge

that he received as a result.  But it was not a firearm.  And

that is something that's at least confusing, until you look and

see what was in the rap sheet.

F9oemacs

And what I am suggesting, certainly in light of what the attorney general and virtually a retinue of many people who are speaking out on this subject, this person is an addict. Certainly he committed the crimes he pled guilty to.  But he's an addict who needs treatment rather than a warehouse sentence, a sentence where -- and he is in the extraordinary position, which I would suggest, at least based upon my experience here, that he has family who are prepared, when the Court sees fit, to permit him to be released, to see that he will be, one, supervised, and more importantly, employed.

And I think the defendant himself realizes, this is his last and only chance, given his daughter's presence, to maintain any type of lengthy relationship as a father, which is probably one of the most important things that he has to say. And he's going to, with your Honor's permission, have a few moments and would like to address the Court to some extent.

But what I am basically seeking here is mercy from the Court to give this gentleman an opportunity to take advantage of the situation he's in; to ask the Court to recognize what is in Dr. Paredes's report, which is, if you take a look at the numbers and the percentiles that are there, the various tests and her diagnoses one way or the other, this is certainly a situation that under normal circumstances could very well be considered for departures under the guidelines.  I'm committed to the plea agreement, but diminished capacity and mental and

F9oemacs

emotional issues are and do give the Court permission at least
to consider those capacities.

        Let me just see here.  I think I may have specific
references to those points.  I recognize that I am tied to the
plea agreement, but I'm talking about 5H1.3 and 5K2.13.  Those
are -- one is diminished capacity and the other is emotional
and mental conditions.

        And again, I recognize, I'm not arguing, as I would
not be permitted to, that they should have been considered for
departures, but they are certainly facts and circumstances of
the case under 3553(a).  They were specifically pointed out by
Dr. Paredes.  The probation department considered it.  They had
no issue or had no interest in revising their report to the
Court.

        And what I'm suggesting, this is a person who should
not be warehoused, who has never served a sentence longer than
two years, four months.  A ten-year sentence, an eight-year
sentence basically is too much for an individual with his
background, with the kind of challenges that he has, and in a
situation under supervised release, where I spent a lot of time
these days, that if, in fact, he does not take advantage of
some mercy shown by the Court beneath the guidelines, he will
be back to serve a very long sentence.

        We are asking for anywhere between three and five
years.  We don't mind five years.  We would say that that would

F9oemacs

give the Court some assurance that the family meant what it
says.  It would give Mr. Maccow an opportunity to spend some
time with his daughter.  And it would allow the Court to keep a
close eye on him through the probation department of his
behavior.

       And then it would permit him -- because you cannot get
a MICA program within the Bureau of Prisons.  I've been through
that issue with Judge Rakoff very recently.  It is only an
outpatient type of situation available.  It is a relatively new
frontier situation to deal with addiction and people also who
have mental infirmities, both of which were pointed out by
Dr. Paredes in her report to the Court.

       THE COURT:  Let me hear from counsel for the
government.

       MR. MASIMORE:  I think we've put in a substantial
submission.  I'm very happy to answer questions for the Court
but I think there's ample reasons for the Court to give a
sentence within the guidelines in this particular case.

       MR. MACK:  Your Honor, I don't mean to interrupt the
Court.

       THE COURT:  Yes, Mr. Mack.

       MR. MACK:  I know Mr. Maccow would like to address the
Court at some time.  That may be in the future, but it is
something I know he wishes to do.

       THE COURT:  Okay.  Let me just hear very briefly again

F9oemacs

1    from you, Mr. Mack.

2              You've indicated that you're asking for a sentence

3    around five years because of Mr. Maccow's -- for many reasons,

4    but because particularly of Mr. Maccow's drug addiction and

5    perhaps mental health issues.  I know that you're not seeking a

6    downward departure.  I, of course, have the right to consider

7    sua sponte any downward departure, but if I were to do so, I'd

8    have to give the parties notice of that.

9              You've mentioned even though you're not moving for a

10   downward departure, certain sections of the guidelines, in

11   particular I suppose 5H1.3, and perhaps you were referring to

12   5H1.4, talking about physical conditions, including drug or

13   alcohol dependence or abuse, in 5H1.42 indicates that drug or

14   alcohol dependence or abuse ordinarily is not a reason for a

15   downward departure.  Substance abuse is highly correlated to an

16   increased propensity to commit crime.  Due to this increased

17   risk, it is highly recommended that a defendant who is

18   incarcerated also be sentenced to supervised release with a

19   requirement that the defendant participate in appropriate

20   substance abuse program, etc.

21             And regarding any potential departure for mental and

22   emotional conditions, to the extent I'm permitted to do that, I

23   choose not to do so.  I certainly have seen the report, or I'm

24   not inclined to do so.  I've seen the report, and certainly

25   that report talks about some issue that Mr. Maccow has in terms

F9oemacs

1    of some mental issues.  Certainly nothing in that report, and I

2    don't believe that counsel has indicated that anything in that

3    report suggests that Mr. Maccow is not competent to proceed or

4    was legally insane at the time that these crimes were being

5    committed.  But I think that your argument is because of

6    this -- of some limitations in terms of cognitive ability, I

7    should consider that under the factors in 18, U.S.C., 3553.

8            MR. MACK:  That is correct, your Honor.  I am not in

9    any way suggesting he is incompetent or insane.  I'm suggesting

10   he has mental illness issues that Dr. Paredes found.  And she

11   recommended a specific program to deal with it, and that they

12   were factors that the Court may consider.  And obviously it's

13   one that I'm urging that a person who, at least as I understand

14   policy, who is an addict and is an individual with mental

15   infirmity, that treatment is an option the Court may consider.

16   And I'm asking the Court to consider it.

17           THE COURT:  Again, very briefly, you indicated that

18   you believe Mr. Maccow doesn't have any real incidents of any

19   sort of violence on his rap sheet.  He didn't get any points

20   for this.  This was a juvenile -- this is a youthful offender

21   adjudication, but he certainly was convicted back in 2001 of a

22   robbery in the second degree, which certainly would qualify as

23   a crime of violence.  Of course, that's back when he was 17

24   years old.

25           But one of the things I am also concerned about is

F9oemacs

Mr. Maccow's criminal record.  I know you've indicated that
when you say he's been suffering from a drug addiction,
especially since 2010 when he was in an accident and started
taking some pills, but certainly his criminal record goes back
far before 2010.

     And one of the concerns that I have is it doesn't
appear that he's ever gone more than 25 months without getting
arrested, each time that he is convicted of a crime, starting
back -- perhaps this is not a crime, but the youthful offender
adjudication.  But he was arrested for that November 25, 2001.
He received a youthful offender adjudication originally
February 1, 2002.  Then he was arrested for a marijuana-related
charge December 16, 2003.  While that was a marijuana-related
charge, that was not possession of marijuana; that was a sale
of marijuana to an undercover officer back December 16, 2003,
certainly less than two years from the adjudication of a
youthful offender and not quite 25 months from his arrest for
that robbery in the second degree.

     Then he was arrested again within -- certainly less
than two years from December 16, 2003, he was arrested again on
February 22, 2004, for another criminal sale of marijuana in
the fourth degree.  And then within two years, on January 5,
2006, he was arrested for aggravated unlicensed operation of a
motor vehicle in the third degree, as well as false
impersonation.

F9oemacs

```
1            Following that, about a month-and-a-half later, he was

2    arrested for criminal mischief.  And February 22, 2006, less

3    than about -- about 18 months later, he was arrested on

4    August 7, 2007, for criminal possession of marijuana.  Then he

5    was arrested on August 23, 2007, 16 days after that other

6    arrest he was arrested on.

7            And then we have the instant offense, and that offense

8    that took place, conspiracy that took place between 2008 and

9    2013.  Then it appears that he's not arrested at least for some

10   time after that.  He was arrested again May 20, 2011, but of

11   course with the information before me, while he wasn't arrested

12   during that time, he was certainly involved in this burglary

13   ring during that period of time.  He was arrested again May 20,

14   2011, and then less than a year later, March 10, 2012,

15   arrested, and May 20th arrested for possession of burglary

16   tools.  He didn't get any criminal history points for that, but

17   was arrested for that, pled guilty and sentenced to a year in

18   custody.  Less than a year later, arrested for possession of

19   marijuana, March 10, 2012.  Then about six months and 90 days

20   later, he was arrested for criminal possession of a controlled

21   substance in the seventh degree, and a couple more of that as

22   well.  Then less than a month later he was arrested for the

23   criminal possession of a weapon in the fourth degree for the

24   knife that you had talked about.  And then less than six months

25   later he was arrested for a reckless endangerment for
```

F9oemacs

1    driving -- operating a four-wheel, all-terrain vehicle on a

2    public street and driving a vehicle on the sidewalk and doing

3    doughnuts in the middle of the street, stopping in the middle

4    of the street, blocking pedestrian and vehicular traffic,

5    providing allegedly the name Andy Duran -- I know you've talked

6    about Andy Duran.  That's not an alias.  That's fine.  But

7    doughnuts in the middle of the street, and allegedly throwing a

8    small bag of marijuana out of that.  Whether that happened or

9    not, that's not part of the charge, but certainly pled guilty

10   to that reckless endangerment.

11         So I'm very concerned about the extent of his criminal

12   record.  It certainly doesn't seem that he's done a real

13   significant time in jail.  Maybe that is one of the problems,

14   because it seems he's not really getting the message that he

15   can't keep doing this.

16         So I'll give you a chance to address that.

17         MR. MACK:  If I may.

18         THE COURT:  Then I'd certainly like to hear if the

19   government has anything else.  Then I'd like to hear from

20   Mr. Maccow.

21         MR. MACK:  Your Honor, I certainly acknowledge that he

22   is a criminal history III individual.  And that has been a

23   factor, obviously, of significance.  And I certainly don't want

24   to look to have him looked at as a criminal history I.

25         I'm also pointing out, though, to the Court that as I

F9oemacs

said, many of the -- he himself told the probation officer he

used marijuana every day since he was -- it's either 12 or 16,

I forget what the situation was.  I'm suggesting to your Honor

that he's already served almost two years.  He was arrested I

think in November 14, 2013.  He -- and I realize it's not

November yet, but what I am asking the Court to consider is a

48-month sentence, which is certainly longer than he has ever

served.  His longest I believe was in August -- or 2008 to '10,

which is two years and four months.

In addition, Dr. Paredes goes through at some length

that he never received the treatment that at least is being

touted these days as an important ingredient for people with

records like this; people who have mental challenges.  And

certainly those are pointed out in the report.  To have

chemical addictive problems, which only got worse, that simply

incarcerating them for warehoused time periods, which is what

the government and the probation department are asking, is not

a way to deal with individuals of this nature.

Certainly there are people who deserve to be

warehoused.  But addicts and mentally ill individuals are not

in that category.  And treatment is considered a far better way

for them to proceed in the future, with the hope that their

criminal record ends.  And that's what I'm suggesting; that

these are circumstances where the fact that he has not had

treatment, that he has been put back in prison, put back in

F9oemacs

prison, have not worked with him.  And there is at least an

argument that can be made that rather than keeping him in

custody for year after year after year -- we're not asking for

time served, but a situation where he has a sentence that he

can serve, that he can be released under strict supervision,

supervisory with family, who are here and would be present to

see where he was and that -- because he believes, as I do, that

this is his last opportunity to avoid being in a situation

where his record and being incarcerated, in essence, takes the

most important part of his life away.  And that's what I'm

urging upon the Court.

         I recognize what you've said to me.  I'm not

dismissing it.  All I'm saying here and begging for is that he

be given the chance and the treatment and the support, given

these circumstances, that at least give the Court an

opportunity in the near future, two years hence, that should he

violate any of the conditions -- use, tested -- you know,

inappropriately, not be employed, commit any further crime or

whatsoever, he's back in custody.  He's gone.  He has given up

and lost his last best opportunity to be a father, a husband

and an individual who can demonstrate to his family that crime

is behind him.  That's what I'm asking.

         If he's warehoused, if he's in a situation where he

doesn't get treatment, BOP, I'm going to ask whatever the

sentence is for the RDAP situation, as something -- we're not

F9oemacs

asking for a time served situation.  We're asking for an

opportunity for this individual, with the challenges that he

has, lack of treatment that he has, to rectify that situation

and make a decent life and -- you know, present himself as a

father and a husband and a family member in very good family,

with people who have done and committed to the Court in the

letters there to keep him away from those elements, who took

advantage of him before -- I'm not suggesting that he didn't

know what he was doing at all.  All I am asking for, as his

counsel, that he receive precisely what I believe, as I read in

the press and read the books, is exactly what people in these

circumstances need:  Treatment and counseling and oversight,

not warehousing.

        And I look upon the guidelines that are proposed both

by the probation department and the government as appropriate

as in essence warehousing this individual and removing an

opportunity for him to demonstrate to the Court that what we've

said and what we've urged as part of our submission is

something that he's committed to doing.

        THE COURT:  Okay.  You indicated that you believe he's

never had the opportunity to have treatment.  It seems to me

that obviously, when he was adjudicated as a youthful offender

many years ago, according to the presentence report, by that

time he was already addicted to marijuana.  He was sentenced

to -- he was adjudicated a youthful offender and given a term

F9oemacs

of probation.  It seems to me that it is possible, if not

likely, that they may have given him drug treatment when he was

on youthful offender status, but even if they didn't, he

certainly was being drug tested during that time.  And it seems

that he -- well, not it seems.  He certainly violated the

conditions of his probation at that time.  I'm not sure what

the warrant was about.  It certainly seems that his probation

was terminated because of a lingering conviction that he had.

But it seems he certainly would have had the opportunity for

drug treatment when he was a youthful offender.  It certainly

seems that he might have had the opportunity for -- let me just

check here to make sure it's okay here -- yes.  It seems like

he -- when he was sentenced to the burglary, that doesn't give

me points because it's part of the relevant conduct here.

        But when he did two years on that burglary from 2008

to 2010, I'll just ask you, wasn't he on some sort of

supervised release in the state or something of that nature

where he was being drug tested and the like?

        MR. MACK:  The answer is no, your Honor.

        THE COURT:  But --

        MR. MACK:  But I would like to say this, because I

spent a lot of time on this issue in other courtrooms within

the last six months.

        Number one, drug treatment has drastically changed in

the last ten years.  This MICA program, which Dr. Paredes is

pretty expert on, as well as one or two other psychiatrists, is

a new way of dealing with people who have both mental illness

challenge and chemical addiction challenge.  It is not offered

by BOP.  They do not have it.  They are maybe years behind in

implementing it.

          The point is ten years ago or what have you, he may

very well have been counseled.  And to some extent -- I'm not

saying treatment -- treatment is not all treatment.  Some

treatments are more effective than others.  And there has been

a steady progression -- I mean, that's why so many people are

saying treatment is the answer to addiction problems, not

incarceration.  They're saying because treatment subjects and

treatment methods have drastically changed and are much more

likely to produce nonrecidivists than they used to be.

          So for me to respond to the way it was when he was a

youthful offender how many years ago -- he's 30 today, where he

was 19 or 20 whenever he was, the fact is that treatment

options have become far better and much more likely to see that

there is no recidivism.  And putting him in prison in the

atmosphere that I frequently see him in one way or the other is

certainly not going to be -- have any likelihood, other than

the punitive one, of producing the individual who can honor;

who is ashamed to be here before his family; who recognizes

that he had a fine start, and that he was loved and cared for

as a youth; that he was the person responsible for where he is

F9oemacs

1     today; and he is the person that was taking 9 to 15 Percocets

2     and liquid heroin or whatever else he was doing.

3              And what I'm suggesting, that during the time period

4     he was not -- the reason these guidelines are as high as they

5     are is because other members of the conspiracy went out and

6     sold drugs, whatever.  I understand that.  He's pled guilty to

7     that.  But in essence, when he was doing the burglarizing, he

8     was taking -- his share or payment for what he did was for his

9     own personal use, and which he used.

10             THE COURT:  And why was he doing that?

11             MR. MACK:  Well, I think it's clearly he wanted -- he

12    wanted the drugs.  That's something.  But I think that question

13    is best asked of him.

14             He was doing that because he was acting criminally,

15    illegally.  I'm not suggesting he deserves an award.  I'm only

16    suggesting that the explanations for the conduct of this

17    individual are different from other people in this conspiracy;

18    that he was a person who was afflicted chemically, and that, in

19    fact, he needs treatment, rather than warehouse incarceration.

20    That's all I'm urging upon the Court.

21             THE COURT:  Okay.  I'll certainly hear if the

22    government has anything to say.  Again, this is the individual

23    who has great potential.  He has a master certification in air

24    conditioning and refrigeration and as an electrician.  He's

25    been working as a welder since he was 12 years old.  According

F9oemacs

1    to the presentence report, until about a month before his

2    arrest he was working off the books installing music systems.

3    So he certainly has the ability to work and earn a living to, I

4    suppose, support his habit, if that were the case.

5            But let me hear if the government has anything they'd

6    like to add at this point.

7            MR. MASIMORE:  Your Honor, I think the one thing I

8    want to just put an accent mark on from our sentence submission

9    that I'm not hearing about now is his postarrest statements.

10   And I completely understand it's in the Court's discretion, not

11   using those statements to enhance anyone else's sentence.  But

12   Mr. Maccow made statements, and he admitted to participating in

13   home invasion robberies with various people he was charged in

14   this case with.  In one invasion he admitted to going inside

15   with others.  They pumped open a door.  They restrained

16   someone.  And one of the coconspirators had a gun.  This is

17   what he had admitted to.  And I think that has to be in this

18   case, I respectfully submit, considered when crafting a

19   sentence.

20           And I understand the movement against warehousing.

21   I'm not sure how to use that as a verb, but the incarcerating

22   defendants simply because a guideline says something, this is

23   not that case.  And this is somebody who a lengthy term of

24   sentence is needed to prevent recidivism and to account for

25   somebody who has at times engaged in dangerous behavior with

F9oemacs

1  some of the people he was charged with.

2          MR. MACK:  Your Honor, may I respond to that?

3  Obviously --

4          THE COURT:  I think I indicated last time, I'm not

5  going to consider those statements in terms of sentencing

6  Mr. Maccow.  I'm not going to consider those statements.  I

7  know that he made those statements, but I'm not considering

8  those in terms of increasing his guidelines or saying that this

9  is relevant conduct toward that.  I'm not considering that.

10         MR. MACK:  Of course I would say, as the government

11 said last time, is that he did the right thing in a sense.  And

12 what he presented at the time period when he was arrested, he

13 made truthful statements.  And so there is at least some -- he

14 was put in 11 South in a situation where he was definitely

15 under significant pressure.  We went through that last time.

16         All I'm suggesting is in some situations, the fact

17 that he made a full statement at the time of arrest is

18 something for commendation rather than criticism.  And I

19 appreciate the Court's position in not considering whatever was

20 said there.

21         THE COURT:  I think defense counsel may be taking a

22 different position now than the position that was taken earlier

23 on that.  But regardless of that fact, I'm not --

24         MR. MACK:  I have no intent in doing that, your Honor.

25         THE COURT:  Mr. Maccow, is there anything you'd like

F9oemacs

1   to say regarding the appropriate sentence in this case?

2               THE DEFENDANT:  Yes, your Honor.

3               THE COURT:  You can remain seated, if you like.

4   That's fine.

5               THE DEFENDANT:  First of all, I want to apologize to

6   you, first and foremost.  I want to apologize to --

7               THE COURT:  Keep your voice up.  It's probably easier

8   if you sit down, with the acoustics.  I don't take any offense

9   to you not standing, but move the microphone closer to you.

10  It's easier to hear me now.

11              THE DEFENDANT:  I also want to apologize to my family

12  here present in the court today.  The thing is that I just --

13  if it's okay, I just want to ask you for some help.

14              First of all, I'm going to ask you for some help

15  because I do realize that I do need some help.  And the sense

16  that I do need some help is that, just like my lawyer said

17  right here, I was an addict, you know.  Presently at this

18  moment, I'm not using no type of drugs or none of that.  But I

19  can say that it's all because of me.  It's mostly because I'm

20  incarcerated there.  I don't -- I don't want to come and do my

21  time and go home and fall under these -- the same things that I

22  used to be before I got incarcerated.  That's why I want to say

23  that I would love for you to give me a treatment, or for you to

24  give me some help, you know what I'm saying?

25              I do understand that everything I did, I did it upon

F9oemacs

myself.  Everything that I'm going through today is because I
took it upon myself, you know.  But to get technical, at the
moment that I was doing certain things I was doing, I wasn't
thinking clearly because I was really using a lot of different
drugs.  I was under the influence of a lot of different drugs.
I wasn't thinking straight.  That doesn't give me the right of
doing what I was doing.  It's just I just want to apologize to
certain people.  I have to apologize.

          I also want to apologize to you for being present in
your court today.  I just wish at least you could give me a
little bit of leniency and let me show you what I'm capable of
doing, you understand?  I want to be part my family.  I know I
wasn't a person I was supposed to be with them, you know what
I'm saying?  But I'm just asking for the leniency, some
forgiveness and a little bit of leniency, if it's okay with
you, your Honor.  Sorry.

          THE COURT:  Thank you.

          Let me ask you that question that I posed to your
attorney, Mr. Maccow.  You have these skills that could help
you earn a pretty decent living.  You have skills as a welder.
You have certificates in air conditioning and refrigeration
repair and as an electrician.  I'm just puzzled as to why you
didn't use those skills.

          THE DEFENDANT:  I could explain to you.  Today -- as
soon as -- as soon as you fill out an application for a job,

F9oemacs

1    the first question they ask you is, have you ever been

2    incarcerated?  Do you have any felonies?  I guarantee you nine

3    out of ten places that you do go and you fill that box yes, all

4    they're going to tell you is, we'll call you.  That call is

5    never going to come.  I guarantee you, that call is never going

6    to come.

7              I try.  I went to different places.  As my little

8    sister is right here in the court, she helped me fill out a lot

9    of applications in the Internet.  Them calls never came

10   through.  Now, I used to go from places to places to places to

11   try to look for a job.  I remember I went looking for a job at

12   a construction company with the skills that I have.  Usually a

13   normal person, they will right away hire a person right away.

14   As soon as they read the skills that I have, they will hire me

15   without thinking about it.

16             What happened, I spoke to the lady that was doing the

17   interview, and she told me just like this; she told me, I don't

18   want you to lose faith.  I don't want you to stop doing what

19   you're doing.  But technically, I can't hire you.

20             I asked her, why is the reason you can't hire me?

21             She told me, you have felonies.

22             It's something that, all right, they do have companies

23   that work with either the BOP, that work with either -- any

24   type of imprisonment place, that they do give jobs to people

25   that have been incarcerated before.  Okay.  I did fill out a

F9oemacs

1    couple applications.  I can guarantee you I filled out a lot of

2    applications.  It's just them calls, to be honest with you,

3    them calls never coming through.  Them calls, them people never

4    call you.  All they tell you is, we'll call you, we'll call

5    you, we'll call you.  They never call.  You know?

6              It's really hard.  You can check it out yourself.

7    Anywhere you go for an interview, the first question -- they

8    don't ask you what skills you have.  They don't ask you what

9    type of person you are.  They don't even take the time to see

10   what type of person you are.  They don't give you a chance.

11   The first thing they do, the first question they ask you is,

12   have you ever been incarcerated?  Do you have any felonies?

13             Now, tell me, a person that's been incarcerated like

14   me, do you think I got any hopes for these places of getting

15   jobs?  I don't have any hopes at these places getting jobs.  I

16   might have more skills than the next person that's sitting next

17   to me.  I might have more skills than them.  But just because

18   I've been incarcerated and that person never been incarcerated,

19   that person gets the job before me.

20             THE COURT:  But I guess what also troubles me is

21   there's been a lot of arguments about general warehousing and

22   general problems with people who have convictions and have been

23   incarcerated.  And obviously I'm concerned about all of those

24   things.  But I'm primarily concerned about you and your case

25   and what I see about you.

F9oemacs

1          And again, I was saying this stuff about the

2     certifications that you have in air conditioning and

3     refrigeration repair and welding to show, again, that you're

4     someone who has promise.  According to the presentence report,

5     this has not been controverted, but according to the

6     presentence report, for two years until about a month before

7     you were arrested, you were working and claiming that you

8     worked off the books installing music systems into cars at

9     Kenny Auto Sound, and that your base salary was 500 to $570 per

10    week, and that you earned about $150 a day in tips.

11         Now, assuming that that is true, and I have no reason

12    to believe that that's not true, if you're working five days a

13    week and you're getting $150 a day in tips and you add that to

14    the base salary that you reported, that's about $60,000 a year.

15    So with that information that I have before me on your case --

16    I'm not talking about in general somebody who's been

17    incarcerated and can't get a job.  In your case for you, you

18    had a very good paying job for two years.  According to the

19    presentence report, you stopped working there about a month

20    before your arrest because you were worried that the

21    authorities were looking for you.

22         That's what I'm having a hard time wrapping my head

23    around, is you're making good money.  I understand you may be

24    struggling with addiction, but $60,000 a year is a very good

25    salary.  And it seems to me that in spite of the addictions

F9oemacs

that you're suffering from -- and I have no doubt that you have

these addictions -- you are sort of a functioning addict in

that you were able to have a job.  You were able to have a

family.  You were able to make certain decisions, and then you

decided to engage in this behavior because it was a quicker and

easier way to get drugs and/or money.

Can you tell me about that?

THE DEFENDANT:  Yes.  Yes, I was working.  Yes, I was

making this type of money.  Yes.  That, no doubt.

It's just that before I used to deal with -- like I

used to be an addict with marijuana, right?  I had -- I had --

something happened to my hand that they prescribed me

painkillers.  Now, painkillers are totally different from a

person who's addicted to marijuana.  Painkillers are things

that once your body gets used to it, you can't live without it.

A lot of people that are people that just get -- it started

using painkillers.  They don't use them because sometimes they

want to use them; it's because their body cannot deal with it.

Every day you wake up, you wake up with a pain.  Every day you

wake up, you wake up with a pain because your body is used to

the drugs that you are putting into your body.

Now, at the moment that you stop taking them, your

whole day is pain.  Your whole day is pain.  Everything hurts.

Everything bothers you.  Now, that's not an excuse for what I

was doing.  It's just I wasn't thinking right.  It got to a

F9oemacs

1  point that -- at the beginning all I used to think about was,

2  how could I make money to be able to support myself and be able

3  to support my family, right?  That was at the beginning, what I

4  used to think about.

5       Then it came to a point that I wasn't even thinking

6  about that.  All I was thinking about, to be honest with you,

7  was my next fix, my next -- and what I got to do to be able to

8  buy this so I can take this pain away.  And it came to a point

9  that it was like too much for me to handle.  It was like, to be

10  honest with you, it was like a point that it was too much for

11  me to handle.  And it was just -- and I messed up.  It came to

12  a point that it just came -- it just went out of control.  It

13  just came out of my hands.  I couldn't handle it no more.

14       And that's what I -- that's when it first started

15  happening, you know.  I wasn't even functioning right no more

16  in certain points.  I was really, really deep into drugs.  So I

17  couldn't even think straight.  60,000 -- you say 60,000 a year,

18  but when you taking from 5 to 15 Percs daily, 60,000 is not

19  enough.  And to be honest with you, 60,000 wasn't enough for

20  what I was going through.  It wasn't.  It wasn't enough for

21  what I was going through, because a normal person, yes, that

22  would be enough.  That would be way more than enough.  And I

23  sit here today and I know that it would be way more than

24  enough.

25       But what I was going through, it wasn't enough.  I was

F9oemacs

going through a real hard time.  At the moments I was going

through so much hard time that I wasn't even thinking about the

people that I was really supposed to be thinking about.  I was

just being selfish and only thinking about my addiction, my

addiction, my addiction and only me.

That's how come I tell you today to, please, I need

some help.  If I could get certain programs, I don't -- like,

yes, I do understand.  I have to do time because I violated.  I

did certain things I wasn't supposed to do, certain things that

nobody's supposed to do.  I harmed people.  I took from people

that was working legit.  I took from people that had their

businesses.  They were supporting their family with their

businesses, and I took their stuff for my habit.  At no moment

did I think I was doing right.  I know I wasn't doing right,

because I was not doing right.  But I wasn't thinking straight

at the moment.  I was doing these certain things.

All I'm asking you is for a little bit of leniency so

that I can show you what am I capable of doing.  I just want to

be able to show you and show my family what I may be capable of

doing.

THE COURT:  Okay.  Anything else from the government

or defense?

MR. MASIMORE:  No, your Honor.  Thank you.

MR. MACK:  Nothing further from the defense, your

Honor.

F9oemacs

1          THE COURT:  And again, just to be clear, I know we're

2     not going to have any sort of Fatico hearing, but let me find

3     out the defense's positioning here.  In terms of the offense

4     conduct that we're talking about here that's been attributed to

5     Mr. Maccow in this case -- this is all conduct for him that

6     took place between February 25, 2011, and October 15, 2013, is

7     that correct?

8          MR. MACK:  I'm not sure I understand the Court's

9     question, your Honor.

10          THE COURT:  My question is that according to the

11     presentence report, Mr. Maccow is involved in this burglary

12     ring, and his specific conduct is starting in February 25,

13     2011, and goes up until approximately no later than October 15,

14     2013?

15          MR. MACK:  That's correct, your Honor.  We're not

16     challenging the presentence report.

17          THE COURT:  So I guess again, I don't want to belabor

18     the point -- and there may not be good answers for this -- but,

19     again, Mr. Maccow, I am taking your case very seriously.  I'm

20     very seriously listening to everything you say, and I have read

21     this presentence report and I have read everything single

22     letter from your family.  And I, again, am paying attention to

23     your particular case, not in general what happens to people who

24     may be addicted to drugs and in general what happens to people

25     being warehoused or whatever that term may be.

F9oemacs

1          You say, again, that you weren't thinking in your

2     right mind.  I think I understand what you're saying is that

3     you should have made better decisions.  But it seems especially

4     so when you just finished doing two years for a burglary with

5     this same group of people, that when you get out, you start

6     doing this same thing again with these same folks.  That is

7     also something that causes me a great deal of concern.  I don't

8     know if there is any good answer to that, but I'll give you an

9     opportunity to address that, if you'd like.

10          THE DEFENDANT:  What I want to say is like I thought

11     about it, and they already got to a point that, to be honest

12     with you, like I told the lady from the presentence report, I

13     am actually tired.  I get the sense that I'm tired.  I'm tired

14     of this whole ordeal.  It seems like I live in here and I go

15     out there for vacation, instead of me living out there, you

16     know, and getting -- and coming here and getting incarcerated.

17     It seems like it's the other way around.  And it's getting to a

18     point that like I really sit down and thought about it, and I

19     said, like is a real, normal person really supposed to be

20     living like this?  Or is it that it's just me that I am a

21     problem?

22          And I came to the conclusion that I really do think

23     that I am the problem.  And the sense I am the problem is that

24     I have to change my life around, because it's going to come a

25     point that when I do look back and think about what did I do,

F9oemacs

what did I accomplish.  I didn't -- I haven't accomplished
nothing.  I haven't been able to say, yes, I did this, yes, I
did that.  I haven't been able to say that I actually spent
time with the people that I am supposed to, I actually could be
spending time with.  I just want to see if -- and not even see.
I just want to be able to like do my time and go home and just
stay away from all this, period.  Just it's not that I can't --
I can't see other people, because I'm not going to sit here and
point fingers to other people, because the problem is me.  It's
not other people.  Because whatever I was doing, I did it
because I wanted to.  It wasn't because other people was
obligating me to do it.  It's because I wanted to do it.

        So I want to see if I could give it to myself, if I
could give it to my family, to be able to do the right thing
for once in my life, be able to do the right thing.  Stop going
out and going back to the same people that I've been going to,
the same people that I've been going to.  Again, these people
don't have nothing to do with what I was doing, because they
didn't obligate me to do what I was doing.  I was doing what I
was doing because I wanted to.

        So I want to see if you can give me a chance to be
able to show it to myself and to be able to show it to my
family that I could do something; that I am more than what the
paper says that I am.  Because in the paper, the papers don't
really know me.  The papers just say these things that I do.

F9oemacs

The papers don't know who I really am.  This is not the person

who I am.  Because when I'm in my right state of mind and I'm

with my family, they can tell you who I really am.  I'm not

this person that these papers say that I am.  I'm not no

violent person.  I don't even like violence.  I'm a very loving

person.  And everybody I chill with, everybody I have time

spending with since, I'm a really good person.

It's just that I have to give myself the opportunity

to show the people that I'm supposed to show who I really am.

It's just I'm -- going by these papers, it says who I'm not --

who I'm not.  You know, it's just the mistakes that I have

done.  I just want to be able to have -- be able to see if I

can get one more chance to show to my family who I really am,

the people that really do know me.  And I just want to leave

everything behind and be able to start brand new.  I have a lot

of trades that I can accomplish.  I have a lot of things that I

really know that I can accomplish.  There's things that I

really do want to do.  It's just I haven't let myself or given

myself the opportunity to really do it.  I know if I go home

and I do at least one more thing wrong, I might fall here, but

I might never go back home, you know.  I just want one more

opportunity.  I want one more chance, if it's okay.

THE COURT:  Okay.  Anything else from the government

or the defense?

MR. MASIMORE:  No.  Thank you, your Honor.

F9oemacs

1                    MR. MACK:  Nothing further, your Honor.

2                    THE COURT:  Is there any reason why sentence should

3     not be imposed?

4                    MR. MASIMORE:  No, your Honor.

5                    MR. MACK:  No.  No, your Honor.

6                    THE COURT:  What is the government's position on

7     restitution?

8                    MR. MASIMORE:  Your Honor, I'll submit information

9     within the statutory time period.

10                   THE COURT:  What's the government's position on

11    forfeiture?

12                   MR. MASIMORE:  There is a previously entered order by

13    consent that will convert to a final order.  So if the Court

14    will make that part of the judgment and conviction, please.

15                   THE COURT:  Okay.  Mr. Maccow, are you satisfied with

16    your legal representation up to this point?

17                   THE DEFENDANT:  Yes, sir.

18                   THE COURT:  Are you ready to proceed with sentencing?

19                   THE DEFENDANT:  Yes, sir.

20                   THE COURT:  I will not impose a fine.  I will impose

21    the $300 special assessment, $100 for each count, Counts One,

22    Two and Three.

23                   Regarding the term of supervised release for Counts

24    One and Two, I will impose a term of three years' supervised

25    release; for Count Three, a term of five years' supervised

F9oemacs

1    release, and all terms of supervised release concurrently to

2    each other.

3            I will impose the mandatory conditions of supervised

4    release.  And Mr. Maccow shall not commit another crime.  He

5    shall not illegally possess a controlled substance.  He shall

6    not possess a firearm or destructive device.  I will suspend

7    the mandatory drug testing condition.  He shall cooperate with

8    the collection of DNA as directed by the probation officer.

9            I will impose the standard conditions of supervision,

10   along with the following special conditions:  That he shall

11   provide the probation officer with access to any requested

12   financial information; that he shall not incur new credit

13   charges or open additional lines of credit without approval of

14   the probation officer, unless the defendant is in compliance

15   with the installment payment schedule.  He shall participate in

16   a program approved by the probation office, which program may

17   include testing to determine whether he has reverted to using

18   drugs or alcohol, and authorize the release of available drug

19   treatment and evaluations of the courts to the drug treatment

20   service providers approved by the probation officer.  He shall

21   be required to contribute to the cost of services rendered in

22   an amount determined by the probation officer based on ability

23   to pay or availability of third-party payment.

24           He shall submit his person, residence, place of

25   business, vehicle or any other premises under his control to a

F9oemacs

search on the basis that the probation officer has reasonable

belief that contraband and evidence of a violation of the

conditions of the release may be found.  The search must be

conducted at a reasonable time and in a reasonable manner.

Failure to submit to a search may be grounds for revocation.

He shall inform any other residents that the premises may be

subject to search pursuant to this condition.

I shall also require that he be evaluated on release

to determine if there are any mental health conditions that

would require any appropriate programs in dealing with any

mental health issues.  He is to report to the nearest probation

office within 72 hours of release from custody.  He should be

supervised in the district of residence.

I realize that I have the authority to downwardly

depart.  I realize that I also have the ability to vary under

the guidelines, and I've considered all the factors in 18,

U.S.C, 3553(a).

Mr. Maccow, I do believe that you have the ability to

do much better than your rap sheet indicates.  And while I

certainly have to consider your record and I have to consider

the crime, I've also considered the factors concerning you and

who you are as a person.  And I feel that it's appropriate for

me to sentence you to a somewhat lengthy period of

incarceration, because while I know that you have this

potential, you certainly haven't actualized that potential thus

F9oemacs

far.  And one of the problems may truly be that in the criminal

justice system, we haven't done a good job of really getting

that message across to you by imposing these light sentences

over and over and over again.

So I want you to try to remain focused while you're in

custody and continue to lean on your family.  And I want to

thank your family for being here and thank you for all the

letters that you've submitted.  I have taken this case, as I

take every case, very seriously, but I've certainly taken your

case very seriously.  I've listened to all the arguments of

your attorney, the arguments of the government and everything

that you have said.  And again, I am concerned about the need

for specific deterrence in this case, because while I think

there are some seeds there in terms of really trying to accept

ownership over your actions, I am still troubled by what I see;

not -- by what your record reflects and by the comments that

you've made here.

Of course, I'm not trying to hold you to any standard

to be some great orator.  I think you've spoken from the heart,

and I think you've told me truly how you feel.  But some of the

arguments that you've made were quite good arguments, but

unfortunately, the facts kind of get in the way of some of

those arguments in terms of the money that you were making

before you were arrested here, the opportunities that you did

have.

F9oemacs

1          And I know that you care deeply about your family and

2     I know that your family cares deeply about you.  You have to

3     take your decisions seriously.  And I know that you do, but you

4     have to take those decisions seriously at the time when you're

5     making those decisions.

6          So the crime here is a serious crime.  And I do think

7     there is certainly a need for specific deterrence, because in

8     particular, you had done two years for this crime with this

9     same group of people, and once you were released, went back to

10    doing the same thing with this same group of people.  And even

11    though you didn't get any criminal history points for that,

12    it's certainly something that I'm considering in terms of the

13    specific deterrence here.

14         And the fact that you're addicted is a very serious

15    thing.  And of course, as you know, that doesn't give you the

16    right to burglarize pharmacies or to commit crimes and the

17    like.  And it seems that the two-year sentence wasn't enough to

18    deter you from that conduct.

19         So while I have the authority to downwardly depart and

20    vary from the guidelines, I choose not to do so.  I've

21    considered all those factors.  I do believe that a sentence at

22    the low end of the guidelines is appropriate in this case.  And

23    I will impose a term of custody of 87 months.

24         Counsel, do you wish for me to recommend the RDAP

25    program?

F9oemacs

```
1              MR. MACK:  I do, your Honor.  As well as if there is

2    any mental counseling program within where he is to be

3    designated, that at least he be considered for that.  And also,

4    I would ask the Court to recommend, if possible, a designation

5    to New Jersey, which is his situation, some facility in

6    New Jersey so he can be closer to the people who are here in

7    court today and other family members.

8              THE COURT:  Counsel for the government, anything on

9    that?

10             MR. MASIMORE:  No, your Honor.

11             THE COURT:  So I will recommend that Mr. Maccow, if

12   qualified, be able to participate in the RDAP program.

13             I also recommend that he be considered for any mental

14   health treatment that's available.  And I will recommend

15   perhaps it's easier, counselor, let me know if you want me to

16   say this a different way.  I'll recommend that, consistent with

17   those recommendations of the RDAP program and any mental health

18   program, that the Bureau of Prisons seek to place him in a

19   facility as close to the New York City metropolitan area as

20   possible.  That may be a little bit more inclusive than just

21   saying New Jersey.  If you want me to say New Jersey, I'll do

22   that.

23             MR. MACK:  I think the New York City area, your Honor,

24   is probably best, given the possibility of those programs being

25   available.
```

F9oemacs

1          THE COURT:  And I'll recommend that he be placed in a

2     facility as close to New York City metropolitan area as

3     possible, consistent with the recommendations of the RDAP

4     program and any mental health treatment.

5          Are there any open counts?

6          MR. MASIMORE:  I believe there are.  To the extent

7     there are, your Honor, the government moves at this time to

8     dismiss them as to this defendant.

9          THE COURT:  That is granted.

10          Mr. Maccow, you have a statutory right to appeal.  You

11     should talk to your lawyer about that.  There are time

12     constraints on your ability to file an appeal, so you should

13     speak to them about that quickly.

14          If you cannot afford to hire a lawyer to prosecute the

15     appeal, the Court will give you an attorney for free.  Do you

16     understand?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  Anything else from the government?

19          MR. MASIMORE:  No, your Honor.

20          THE COURT:  Anything else from the defense?

21          MR. MACK:  No, your Honor.

22          THE COURT:  I just want to say in closing, good luck

23     to you, Mr. Maccow.  I know that this probably is not what you

24     were hoping for in terms of the sentence here, but I sincerely

25     hope that you can get things together.  I hope that you will

F9oemacs

1    continue to lean on your family; that your family I know will

2    continue to support you and you shouldn't give up hope.  You

3    are more than what you have done.  You are not the equivalent

4    of the bad decisions that you've made.  But you've got to take

5    it seriously and start making some better decisions.  And with

6    your family's help, I sincerely hope that you will.

7            Thank you.  And again, I want to thank the family

8    again for all of their letters and for being here today.

9            (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25